UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff–Appellant,

  v.                                                      Case No. 12-C-704

TONY K. STEINMANN,

    Defendant–Appellee.

**DECISION AND ORDER**

      This is an appeal from the order of the Bankruptcy Court for the Eastern District of Wisconsin dismissing the complaint of the United States (the "Government" or "IRS") seeking to deny Tony Steinmann (the "Debtor") a discharge of an unpaid tax liability of $1,160,779.35. The Debtor filed a Chapter 7 bankruptcy on September 15, 2011. The Government commenced an adversary proceeding against the Debtor, alleging that Steinmann's 2000 tax debt was nondischargeable under 11 U.S.C. § 523(a)(1)(C) or § 727(a)(5). After a two-day trial held on May 23 and 24, 2012, the bankruptcy court issued a decision dismissing the Government's complaint. The Government raises two issues on appeal from that decision: (1) whether the bankruptcy court erred in concluding that the Government did not prove that the Debtor willfully attempted to evade paying his 2000 federal tax liability and (2) whether the bankruptcy court erred in determining that the Debtor satisfactorily explained the disposition of the money he received in the years before filing his petition for bankruptcy. For the reasons set forth below, the bankruptcy court's decision will be affirmed.

## BACKGROUND

The tax liability for which Steinmann seeks a discharge is predicated on unreported income that he and his former wife, Rose Mennella, received in settlement of a lawsuit. Steinmann and Mennella were married in 1994. At the time of their marriage, Steinmann worked for Berner Cheese Corporation and Mennella owned a company called Dairy Source, Inc., that did business with Berner Cheese. Sometime thereafter, Steinmann went to work for Dairy Source and a dispute arose with his former employer. Steinmann, Mennella and Dairy Source sued Berner Cheese, and the suit was settled in 2000 with Berner Cheese agreeing to pay them $1.35 million. According to Steinmann, their attorney classified the settlement as a personal injury recovery and for that reason it was not reported as income on their 2000 tax return.

In 2003, Steinmann and Mennella filed for divorce. The divorce was extremely contentious, ultimately making its way to the Wisconsin Supreme Court. *Steinmann v. Steinmann*, 2008 WI 43, 309 Wis. 2d 29, 749 N.W.2d 145. There were significant assets in the marital estate, many of them purchased primarily or solely with Mennella's individual property. *Id.* at ¶ 12. She apparently felt strongly that many of these assets should have been treated as her separate property under the marital property agreement the couple had signed, but the divorce court apparently sided with Steinmann as to many of the assets. Both parties were aware during the pendency of their divorce proceedings that they would have a significant tax liability due to their failure to report the Berner settlement income. The divorce court divided the settlement equally between Mennella, Steinmann and Dairy Source, which Mennella owned individually, but declined the request to apportion the tax liability between Steinmann and Mennella since the amount of the liability had not yet been determined. *Id.* at ¶ 13. The court entered its judgment of divorce in May 2005.

Shortly after the judgment was entered and before the IRS completed its assessment, Steinmann received $773,135 as part of the property division which, after attorney's fees, netted him $408,989. Upon receiving the pay-out from the property division, Steinmann met with an attorney and put together a comprehensive estate plan that included the creation of a revocable trust. On September 13, 2005, Steinmann had $281,798.42 deposited in his brother's bank account, and a month later used $204,000 of that amount for the purchase of a house which he placed in his trust. On April 25, 2007, he put $10,000 down on the purchase of a yacht which he also placed in the trust. Steinmann testified that at the time he was trying to protect his personal assets for the benefit of his children and believed that the tax liability would be paid out of the sale of some of the marital assets that were yet to be liquidated. Among the assets that remained to be liquidated was a lot on San Marco Island that the trial judge had valued at $2.15 million. Steinmann testified that it was his belief that this property would be more than sufficient to cover the tax liability which the IRS finally assessed against Steinmann and Mennella jointly with interest and penalties totaling $1,345,347.03 in October 2006. Even though the debt was owed jointly by Steinmann and Mennella, Steinmann viewed his obligation as one third of the total, or about $450,000, based on the divorce court's division of the proceeds of the settlement.

The divorce court ordered the San Marco property sold in June 2005. Unfortunately, Mennella filed a lis pendens on the property and did everything she could, even going to jail for contempt, to prevent the sale. As Mennella continued to delay the sale of the San Marco property, the amount of the tax liability increased, due to the accumulation of interest and penalties, and the value of the property decreased, due to the economic downturn in the real estate market. Between February 2007 and May 2008, the tax debt had grown from $1.385 million to $1.67 million. In the meantime, the property was appraised in September 2007 at $1.25 million, and an April 2009 appraisal showed a drop

3

to $850,000. Eventually, the divorce court appointed a special master, and the property was finally sold for $750,000 on December 1, 2009. On March 2, 2009, $670,877.73 of the sale proceeds was applied to the 2000 tax debt.

The Government introduced evidence of other property or funds Steinmann received in the property division or from other sources that in its view should have been used to pay at least a portion of the tax debt. In addition to the house and yacht purchased with the funds deposited in his brother's checking account, the Government notes that in October 2005, Steinmann had his brother write a check for almost $80,000 to his fiancé, Mary Ellen Nathan, which she then deposited in her personal account for Steinmann's use. Steinmann also started a business with a partner named Y Not Foods, Inc., which operated in Wisconsin under the name "Y Not Wisconsin". The business was essentially a food brokerage which earned income consisting of a commission on the transactions it arranged. Y Not Wisconsin reported annual income from the business rising from $60,000 in 2006 to almost $100,000 in 2008. In 2007, Steinmann's partner paid him $108,000 for the customer base and went his separate way with Steinmann retaining the company name. For a time, Steinmann continued to operate the business out of his home.

In September 2008, Steinmann received a notice from the IRS advising him of its intent to levy on his business receivables. Corporate tax returns show a precipitous drop in income from the business thereafter to a loss of $11,339 in 2010. Articles of dissolution of Y Not Wisconsin were filed on August 24, 2011. In the meantime, in January 2009, Y Not Foods, Inc., was incorporated in Florida ("Y Not Florida") by Nathan. The initial deposit into the new business' checking account was a $5,000 cashier's check listing Steinmann as the remitter of the funds. In March 2009, Steinmann transferred $25,000 from Y Not-Wisconsin's checking account into Y Not-Florida's account. Steinmann

4

thereafter began working for Y Not-Florida, on occasion even holding himself out as owner and/or president of the company. Between January and May 2009, Steinmann transferred almost $40,000 into his fiancé's account for his personal use. Steinmann has been issued corporate credit cards by Y Not Florida for business expenses incurred in meeting and entertaining clients, but did not receive wages or compensation from Y Not Florida, at least initially.

Steinmann testified that he had no checking account of his own by this time because whatever money was deposited would be levied on. Steinmann testified that he used a line of credit with Chase Bank to make deposits in Nathan's account so she could start up the business and buy equipment. He had paid the line of credit down with one of the last payments he received from the property division in his divorce. He also said he cashed out his last IRA worth about $19,000 to place funds in Nathan's account so that he could pay his living expenses and other individual debts.

Steinmann also testified that Y Not Florida was Nathan's idea and that the business was significantly different than the business of Y Not Wisconsin. It actually manufactured and sold food products, as opposed to buying and selling commodities as a broker. Steinmann testified that he was primarily involved in sales for the business now, and although he had not taken any salary when it was starting, he was now paid an annual salary of $31,000. He acknowledged that he may have held himself out to others in certain contexts as an owner, but testified that he did not have any ownership interest in Y Not Florida.

The Government placed particular emphasis on Steinmann's interactions with a company called Elite Cosmetic Laboratories. Steinmann used some of the proceeds from the sale of the customer base for Y Not-Wisconsin to acquire a 50 percent interest in Elite Cosmetic Laboratories, Inc. (Elite) in 2007. By the end of the year, he concluded that the investment was worthless and, on the advice of his

accountant, wrote it off as a loss against the gain he received on the sale of the customer list. He sold the Elite stock to Nathan for $1.00. In April 2008, however, Steinmann brought suit in California against Elite and Jill and John Raede, the owners of the other 50 percent, for fraud. Steinmann indicated in his complaint that he was the owner of half the shares of Elite stock. In March 2009, Steinmann settled his case against Elite and the Raedes. Pursuant to the settlement agreement, the Raedes and Elite agreed to pay Steinmann $50,000 in the form of a lump sum of $20,000 and a $30,000 promissory note. These payments were made to Steinmann's fiancé and her company rather than to him. Steinmann testified that he decided to bring the suit after he sold the stock to Nathan and claimed he was acting on her behalf, since by that time she was the owner of the stock. Nathan, he testified, paid the costs and attorney's fees for the lawsuit.

Much of Steinmann's testimony was corroborated by his accountant and divorce attorney. The accountant described his advice to Steinmann in connection with the Elite Cosmetics transaction and his own unsuccessful efforts on Steinmann's behalf to obtain a conditional release of the IRS's lien on the San Marco property that would have allowed the sale of the property for $1.1 million as late as June 2008. Steinmann's divorce attorney testified about his efforts on behalf of Steinmann to force Mennella to release her lien and cooperate in the sale of the San Marco property so that the proceeds could be used to pay the tax debt. He also recounted his efforts to enforce Mennella's obligation to pay Steinmann the maintenance or alimony the divorce court had ordered, even though any payments she made were collected by the IRS due to its levy.

Based on all of the evidence, the Government argued that Steinmann had willfully attempted to evade his federal tax liability and was not entitled to a discharge under 11 U.S.C. § 523(a)(1)(C). The Government also argued Steinmann had failed to adequately explain the loss of assets that could

6

have been used to meet his liabilities. The bankruptcy court disagreed. The court found that Steinmann had credibly testified as to the disposition of the property he received under the judgment of divorce. The court also found that the Government had failed to meet its burden in showing that Steinmann had willfully sought to evade his tax liability. Although the court acknowledged that the "evidence certainly raised several red flags as to the Debtor's conduct," it also noted that Steinmann had presented significant credible evidence that he did not intentionally attempt to evade his tax liability.

In so ruling, the bankruptcy court rejected the Government's assertion that Y Not Florida was simply a continuation of Steinmann's prior corporation intended to assist him in evading his taxes. The court noted that although the names of the businesses were same, Nathan's business had a totally different business model and she testified, credibly in the court's view, as to the inception and operation of the business. Steinmann's transfers to his brother, the court noted, were made before the tax liability was finally determined by the IRS and were almost immediately used to finance the purchase and remodeling of his home. Other funds used to help Nathan were borrowed from a home equity line of credit, and an IRA was liquidated to pay living expenses. The Elite Cosmetics settlement, the court noted, was questionable if viewed in a vacuum, but when considered with the totality of evidence, especially Steinmann's efforts to sell the San Marco property over Mennella's continued interference, the court concluded that his failure to pay was not willful. It is from this decision that the Government appeals.

## LEGAL STANDARD

Federal district courts have jurisdiction to hear appeals of bankruptcy court orders under 28 U.S.C. § 158(a). A bankruptcy judge's "[f]actual findings are reviewed for clear error; [and] legal

7

conclusions are reviewed de novo." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007); *accord In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009) (quoting *United States v. U .S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). When there are "two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous." *Carnes Co. v. Stone Creek Mechanical, Inc.*, 412 F.3d 845, 848 (7th Cir. 2005). A reviewing court must "afford great deference to the trial court's assessment of witness credibility; indeed, . . . a trial court's credibility determination 'can virtually never amount to clear error.'" *Id.* at 848 (quoting *Lac Du Flambeau v. Stop Treaty Abuse-Wisconsin, Inc.*, 41 F.3d 1190, 1194 (7th Cir. 1994)). Ultimately on review, a district court "may affirm on any basis that is supported by the record so long as it has been fairly presented." *In re Airadigm Commc'ns., Inc.*, 616 F.3d 642, 652 (7th Cir. 2010) (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901 n.2 (7th Cir. 2010)).

## ANALYSIS

### A. Section 727(a)(5) Claim

Under § 727(a)(5), a debtor may be denied a discharge if he "fail[s] to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." The bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996). "The creditor has the initial burden to establish that there has been a loss or disappearance of assets; then,

8

the burden shifts to the debtor to satisfactorily explain the loss of assets. . . . A satisfactory explanation of a loss of assets 'must consist of more than . . . vague, indefinite, and uncorroborated' assertions by the debtor." *In re Hudgens*, 149 Fed. Appx. 480, 488 (7th Cir. 2005) (quoting *D'Agnese*, 86 F.3d at 734). While documentation is a preferable and a very good way for a debtor to explain any loss of assets, there is "no bright line rule . . . that a debtor must present documentary evidence in order for an explanation of asset loss to be satisfactory." *Id.*

The Government argues that the bankruptcy court erred in its determination that Steinmann satisfactorily explained the disposition of assets he received pursuant to the divorce settlement proceeds between 2005 and 2009 and the income he received between 2005 and 2011. The Government contends that the bankruptcy court erred because under 11 U.S.C. § 727(a)(5), the Debtor had the burden of explaining the disposition of *all* the money he received between 2005 and 2011. (Appellant Br. 24.) In support of its argument, the Government highlights various unexplained transactions that occurred between 2005 and 2011, totaling $536,809.38. (*Id.* at 36-37.) The Government points to a stipulation between the parties that Steinmann received $600,529.12 from the divorce settlement proceeds, $453,677 from income between 2005 and 2011, and asserts that Steinmann received another $774,238.84. (*Id.* at 19-22.) But there is no indication that the $774,238.84 "received" by Steinmann was actually separate from the money he received from the divorce settlement or his income. The Government appears to be double-counting.

The bankruptcy judge made a credibility determination that Steinmann satisfactorily explained the disposition of his assets. (Bankr. Court Dec. at 1 (hereinafter Decision)). The Government's reliance on *In re Martin*, 698 F.2d 883 (7th Cir. 1983), for the proposition the bankruptcy court erred in its finding that Steinmann met his burden by "merely finding" that his explanation was sufficient

9

is misplaced. (Appellant Br. 40.) In that case, the court reversed the bankruptcy court decision because the debtor offered *no* explanation for the disposition of his assets. *Id.* at 886. Here by contrast, Steinmann did offer an explanation for the disposition of his assets. For instance, he used the assets for living expenses, a down payment on a boat, and remodeling for his house and boat prior to the tax assessment being made. (*See, e.g.*, Tr. Steinmann Test. 11:17-16:22, ECF No. 1-2, at 426-31.) The bankruptcy judge found his testimony about the disposition of his assets credible. Given the amount of time that had passed and the various purposes for which the money had been spent, the fact that Steinmann was unable to provide documentation for all of his expenses was not surprising. Nevertheless, the bankruptcy court, upon its consideration of the testimony and review of the exhibits, concluded that Steinmann had credibly explained the disposition of his assets and income. This court is unable to say that the bankruptcy court's finding on this issue is clearly erroneous. Accordingly, the Government is not entitled to reversal on this issue.

### B. Section 523(a)(1)(C) Claim

Debtors seeking relief under Chapter 7 of the Bankruptcy Code may have their debts incurred prior to filing for bankruptcy protection discharged. 11 U.S.C. § 727(b). This also includes tax debts. However, a debtor who willfully attempts in any manner to evade paying his tax debts may not have his debts discharged because bankruptcy protection is meant to only cover the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); 11 U.S.C. § 523(a)(1)(C). Section 523(a)(1)(C) contains both a conduct and an intent requirement. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996). In terms of the conduct requirement, "nonpayment of a tax alone is not sufficient to bar discharge of a tax liability." *Id.* Instead, in the situation that a debtor fails to "pay a known tax duty . . . where a defendant takes other measures to conceal assets or income from the IRS, . . . a court may

10

reasonably find that the debtor sought to 'evade or defeat' his tax liabilities." *Id.* at 951-52 (citations omitted). For the intent requirement, the debtor's attempts to evade his tax liabilities must be "willful." This has been interpreted to "require that the debtor's attempts to avoid his tax liability were 'voluntary, conscious, and intentional.'" *Id.* at 952. Thus, the debtor must both "(1) know that he has a tax duty under the law, and (2) voluntarily and intentionally attempt to violate that duty." *Id.* The Government bore the burden to prove by a preponderance of the evidence that the Debtor willfully attempted to evade his tax liability. *See Grogan*, 498 U.S. at 291.

The Government argues that it more than met its burden and the bankruptcy court committed clear error in finding that Steinmann did not act with intent to evade payment of his taxes. The Government contends that the court erred because even though the Debtor was engaged in good faith efforts to sell the San Marco property, the value of the property was no longer sufficient to cover the entire tax debt after several years had passed. Thus, despite his good faith efforts to pay the tax debt through a sale of the San Marco property, the Government contends that Steinmann nevertheless willfully attempted to evade his tax debt by his failure to use his individual assets to pay the debt.

Many of the actions that the Government contends show such an intent, however, occurred either before the IRS had arrived at its assessment or before it had become clear that the sale of the San Marco property would not generate the funds needed to pay the debt off. To be sure, Steinmann did not wish to use his individual property to pay off a joint debt he owed with Mennella. His experience in the divorce proceeding apparently convinced him that it would be difficult or impossible to get her to contribute her share if he paid the debt out of his solely owned property. But that is not the same as intending that the debt not be paid. He incurred significant attorney's fees in his efforts to compel Mennella to cooperate in the sale of the San Marco property at a time when it was reasonable to believe

11

it would have covered the debt. He also incurred attorneys fees in returning to the divorce court to compel her to pay him the maintenance that the court had ordered, even though he knew at the time that any payments she made would be levied upon by the IRS. The bankruptcy court considered the testimony of both Steinmann and Mennella regarding the reasons for delay in the sale of the San Marco property and found Steinmann's account fully credible, whereas the court found Mennella's account "(and virtually all of her testimony) totally incredible." (Decision at 3.)

The Government argues that while the evidence established that the San Marco property could have covered the tax liability in full in 2005, this was no longer the case by mid-2007. Put simply, circumstances had changed. The Government contends that the bankruptcy judge did not take these changed circumstances into account in assessing whether Steinmann willfully attempted to evade his tax liability at the time that he settled the Elite litigation and had the payments from the settlement directed to his fiancé and her company. The Government's argument for clear error relies principally on the bankruptcy judge's statement that at the time of the Elite transaction, "the Debtor was engaged in significant good faith efforts to sell a valuable asset—the Marco Island property—that could have paid the tax liability in full." (*Id.*)

The Government overstates the significance of the bankruptcy judge's statement that the San Marco property could have paid the entire debt at the time the Elite transaction transpired. The key issue in this case was whether the Debtor willfully attempted to evade his tax liability. Just because the San Marco property could not have paid the entire debt does not necessarily mean that Steinmann willfully attempted to avoid his liability when he disposed of his other assets. The bankruptcy judge was correct in her observation that when viewed in a vacuum, the Elite transaction could have supported the inference that the Debtor willfully attempted to evade his tax duty. Had the San Marco

12

property not been available to cover a significant portion of the debt, the Government's case here would be a much stronger one.

Section 523(a)(1)(C) requires proof of two elements: conduct which evidences an attempt to evade a tax duty and a mental state where the Debtor's attempt to evade a tax duty was willful. *Birkenstock*, 87 F.3d at 951. The bankruptcy court judge was entitled to view the evidence as a whole when assessing the Debtor's mental state in regard to the Elite transaction. The Government failed on its burden of proof on the second element because the bankruptcy judge found credible the Debtor's testimony as to his intent to use the San Marco property to pay the debt. The bankruptcy court could have concluded on the basis of the Elite transaction and other evidence that Steinmann willfully attempted to evade his tax debt. But instead the court concluded that Steinmann's good faith efforts between 2005 and 2009 to have the San Marco property sold in order to pay the tax debt presented another and more persuasive view that he did not willfully attempt to evade his tax responsibilities at the time the events surrounding the Elite transaction transpired. As noted above, the court acknowledged that the transaction was questionable, but concluded that viewed in the larger context it did not support a finding that Steinmann had willfully attempted to evade his taxes:

> If viewed in a vacuum, the Elite Cosmetics transaction may have substantiated the Government's argument that the Debtor had the requisite mental state to willfully attempt to evade the tax. However, the evidence was overwhelming that at the same time as this transaction was unfolding, the Debtor was engaged in significant good faith efforts to sell a valuable asset—the Marco Island property—that could have paid the tax liability in full.

(Decision at 2.)

The Government further argues that by the time Steinmann settled his lawsuit with the Raedes over the Elite Cosmetics transaction it was clear that the value of the San Marco property was

13

significantly less than the tax debt. Thus, the Government argues, the court committed clear error in failing to find that Steinmann acted willfully to evade his tax liability when he directed the payment of the settlement proceeds to Nathan.

The problem with the Government's argument is that it assumes the bankruptcy court viewed the settlement proceeds as property owned by Steinmann. This ignores the testimony of Steinmann, which was supported by his accountant, that he sold his stock in Elite Cosmetics to Nathan for a dollar so that he could offset the capital gain he received from his sale of the customer list for Y Not Wisconsin to his partner. Steinmann testified that at the time, he thought Elite Cosmetics was worthless. Although he later brought suit in his own name, he claimed he was really acting on behalf of Nathan, the true owner, and that she actually paid the costs and attorneys fees for the action. The bankruptcy court found Steinmann credible, and without knowing more of the details of the lawsuit, this court is in no position to conclude its finding constitutes clear error. It was in this context that the bankruptcy court concluded that the Elite transaction did not require the finding that Steinmann had willfully avoided his tax liability despite the questionable nature of the transaction.

Certainly, the court could have found otherwise. But having observed the witnesses as they testified, the bankruptcy court was in the best position to assess their credibility. The court found that Steinmann lacked the state of mind needed to deny him a discharge. Its decision is not clearly erroneous and is therefore affirmed.

**SO ORDERD** this __26th__ day of March, 2013.

     s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court

14